# Exhibit 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff / Respondent, <br><br> v. <br><br> BRIAN KELSEY, <br><br> Defendant / Movant. | No. 3:21-cr-00264-1 |

## DECLARATION OF MICHAEL J. SPARKS

I, Michael J. Sparks, the undersigned "Declarant," am over eighteen (18) years of age. I submit this Declaration pursuant to 28 U.S.C. § 1746 and state as follows:

1. I am a currently a Tennessee State Representative, representing the 49th Legislative District. I live in Smyrna, Tennessee.

2. I was first elected state representative in November 2010.

3. When I first ran for state representative in the fall of 2010, the Tennessee Republican Party chairman said I was being outspent 5 to 1, and I was doing terrible on raising money. My opponent was the Chairman of the Civil Justice Committee, a Vanderbilt Law School graduate, and strangely enough, former stepson of my late mentor, who supported me over his stepson. Needless to say, the odds were stacked against me. I told the state party chairman that I can beat my opponent, outwork him, and speak up for what is right. I said, "The Lord will fight

this battle, and I will win this race!" I had kneeled down beside my bed each morning like a small child, asking God to give me his favor and wisdom and to bring the right people into my life to help me win. Ironically, the next day, Brian Kelsey called me and said, "Are you Mike Sparks?" I responded, "Yes." He said, "I have a check for you for $2,300."

4. Six years later, when Senator Kelsey was running for Congress, he asked me for a donation to his campaign, and I didn't think twice about giving him a donation. Whenever anyone calls me and asks for help with any election, I always try to be encouraging and helpful because I know how hard it is to put yourself out there publicly and run. I'll help anybody. I don't care if it's a dog catcher running for office. Senator Kelsey had helped me years ago, so certainly I would help him.

5. Roughly five years ago, I was interviewed in Smyrna, Tennessee by the Federal Bureau of Investigation about my $250 donation to Senator Kelsey's 2016 congressional campaign.

6. I assumed they thought I had valuable information to provide to their investigation because I was told to come back for a second interview in front of a Grand Jury.

7. Prior to that, I was interviewed in a room in the Nashville federal courthouse with multiple people, whom I assumed were FBI agents and prosecutors. They told me that I was about to go before a Grand Jury to tell my story.

8. When they began to ask me questions, I asked them something to the effect of, "Didn't Senator Kelsey lose his election?" "With all the corruption going on,

2

why aren't you investigating those things?" "Why are we here talking about this?"

9. In the twelve years in which I served in the state legislature with Senator Kelsey, I never witnessed him do anything unethical, corrupt, or criminal.

10. When I told the FBI and prosecutors about my first encounter with Senator Kelsey, they responded in an excited tone like they had something and asked, "Why would he do that?" I said, "You tell me. I never met Senator Kelsey in my life. He did it because the Good Lord told him to."

11. There was a tall, lanky guy who asked me questions, who kind of had an attitude and was arrogant in the way he treated me. He was rude, and he cut me off.

12. When I started to tell my story of how Senator Kelsey and I knew each other, he got upset and said something to the effect of, "You gotta stick to the 'script.' You're about to go in front of a Grand Jury." In other words, "When you get on the stand, you've got to say these things. You've got to stick to this." He directly told me that I had to stick to a certain wording (script/narrative, etc.).

13. I felt that he had some type of personal vendetta or issue with Senator Kelsey.

14. I asked them something to the effect of, "How am I going to testify if you don't want to hear my testimony?"

15. After I shared with them my testimony about how the Lord opened doors for me, it was obvious to me that my story didn't fit the narrative they wanted to create for the Grand Jury.

16. After that, they huddled up outside the door to talk. Then they came

back and said, "You're free to go."

17. I never did get to tell my story about Senator Kelsey to the Grand Jury.

18. I felt so bad about how they had treated me that I thought long and hard about telling the FBI about it.

19. About a year and a half ago, I told a high profile WTVF investigative reporter that I was willing to talk about how uncomfortable the FBI made me feel when they were interrogating me regarding Senator Kelsey.

20. Four months ago, I told my story to a friend who had a platform in the media, but he told me to drop it.

21. I just happened to contact Senator Kelsey this week after this being on my mind for a few years, and I asked him how he was doing.

22. I would like to get a copy of my interview, if it was recorded. If they would release it, it would verify what happened.

23. I'm happy to take the stand and testify on Senator Kelsey's behalf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 9, 2025.

*Michael J. Sparks*
_____
Michael J. Sparks